GODAIR, HARDING & CO. v. J. T. W. TILLAR.

Decided November 5, 1898.

### 1. Estoppel—Junior and Senior Mortgages.

A second mortgagee of cattle, whose mortgage recognizes the superiority of the lien of a prior mortgage, can not avail himself of an estoppel against the first mortgagee to claim the proceeds of a sale of the cattle under the second mortgage upon the ground that the manner in which the mortgagor, with the consent of the first mortgagee, conducted the business was such as to warrant the conclusion by persons dealing with the matter that he had authority to sell the cattle without restriction.

### 2. Chattel Mortgages—Power of Sale in Mortgagor.

The rule that, where the mortgagee of personal property consents that the mortgagor remain in possession, with authority to sell the property, the latter be-

comes the mortgagee's agent, and a sale by him passes the title free from the lien of the mortgagee, does not apply as between the first mortgagee and a second mortgagee whose mortgage recognizes the superiority of the first mortgage.

**3. Practice on Appeal.**

The appellate court will not examine a manuscript record of 300 pages, in order to find what particular objections were considered by the trial court in rulings on evidence complained of in the brief which does not state the particular grounds of objection.

**4. Same—Harmless Error.**

The giving of a rule of evidence in a charge is not reversible error where the pleadings put in issue the matter to which the rule relates, and the evidence admits of but one finding on that issue.

APPEAL from Tarrant. Tried below before Hon. IRBY DUNKLIN.

*Matlock, Cowan & Burney,* for appellants.

*Pruitt & Smith,* for appellee.

STEPHENS. ASSOCIATE JUSTICE.—This suit was brought by the appellee, J. T. W. Tillar, as the holder of a first mortgage upon a stock of cattle belonging to J. L. Gray & Co., a firm composed of J. L. and George G. Gray, against the appellants, Godair, Harding & Co., for a conversion of the cattle, and in the alternative, for a conversion of the proceeds arising from the sales thereof, which resulted in a verdict and judgment in favor of the appellee for the sum of $9000, from which this appeal is prosecuted.

On the 28th day of January, 1892, J. L. Gray & Co. purchased from J. T. W. Tillar his cattle and ranch upon which they were located, known as the Block Ranch, situated in Midland County, Texas, and in part payment therefor executed their four several promissory notes for $13,450 each, payable to said Tillar on the 1st day of November, 1892, 1893, 1894, and 1895, the notes drawing interest at the rate of 10 per cent per annum, and providing for 10 per cent additional to cover attorney's fees, if sued upon. To secure the payment of these notes, Gray & Co. executed a chattel mortgage upon the cattle, in the form of a deed of trust, naming J. A. Walker as trustee, which authorized him to sell the cattle in default of payment of the notes. The mortgage was duly recorded, and Gray & Co. remained in possession of the cattle, which were branded in the various brands described in the mortgage.

As a part of the transaction, the following written agreement of the same date was entered into:

"*State of Texas, County of Mitchell.* * * * * As part of the contract of sale of this date, it is further agreed by and between J. T. W. Tillar, of Pulaski County, Arkansas, and J. L. Gray & Co., a firm composed of J. L. Gray and George G. Gray, of Midland County, Texas, that said J. L. Gray & Co. shall pay all taxes assessed against the Block Ranch for the year 1892.

"That said J. L. Gray & Co. may use the proceeds of the first cattle sold by them and mortgaged to said Tillar to defray expenses of running and maintaining said ranch, which amount shall not exceed the sum of two thousand five hundred dollars ($2500) per annum, and to pay freight and pasturage of any of said cattle which they may deem best to be shipped to the Indian Territory, but the remainder of the proceeds of any and all sales that may be made from time to time shall be applied in payment of the several purchase notes.

"Witness our hands, this 28th day of January, 1892.

BEN J. TILLAR,

"Agent for J. T. W. Tillar.

"J. L. GRAY & Co.,

"By Geo. G. Gray."

On the 10th day of November, 1893, the first two notes having been paid off, Gray & Co. executed another mortgage, in all respects similar to the first, to secure the two remaining notes and two other notes for $550 each, due May 14, 1894 and 1895, on cattle branded as therein set out. These two mortgages covered all the cattle running on the Block Ranch owned by J. L. Gray & Co., and their increase. All the notes were paid on or before maturity, except the one due November 1, 1895, for $13,450, upon which several credits were entered, reducing the balance due thereon, principal, interest, and attorney's fees, at the date of the trial, January, 1898, to the sum of $9650.

In March, 1894, Gray & Co. borrowed of Godair, Harding & Co., a live stock commission company doing business at Chicago, St. Louis, and other places, the appellants herein, the sum of $9700, to secure the payment of which they executed a chattel mortgage upon a certain brand of cattle belonging to or in the name of one of the children of George G. Gray, of the estimated number of 500, though according to the evidence introduced by the appellee, and presumptively accepted by the jury, the number did not exceed fifty or fifty-five head, and a further and second mortgage upon the same cattle covered by the mortgages in favor of the appellee. Said mortgage recited and recognized the prior liens in favor of appellee, and also referred to the agreement above quoted as a part thereof, and contained among others the following stipulation: "All of said cattle as mentioned above are to be held in said pastures and ranches and fed by the mortgagors during the term of this mortgage, and at least three days before the maturity of the notes herein mentioned 2000 of said cattle shall be shipped and consigned to Godair, Harding & Co., at National Stock Yards, Illinois, and sold by it on commission in the usual and customary way, and out of the proceeds they shall pay themselves (Godair, Harding & Co.) the herein mentioned indebtedness and a commission of 50 cents per head on the whole number of cattle mentioned herein."

About the time of the execution of this mortgage most of the cattle, on account of the drouth then prevailing in that section, were moved

from the Block Ranch in Midland County to Gray County, and during the fall of that year nearly all the cattle, both from Gray and Midland counties, were shipped to the order of Godair, Harding & Co., and sold on the market at Kansas City and East St. Louis, and the proceeds, including also a small shipment made in the year 1895 of the same brand of cattle in the name of one Crowley, were appropriated to the payment of the debt of Godair, Harding & Co., except the sum of $3000 remitted to appellee and credited upon his debt. The remnant of cattle and other ranch property, which was of small value, was thereafter, in a settlement between the appellee and J. L. Gray & Co., disposed of and likewise credited upon appellee's debt, leaving unpaid the sum of $9650, as stated above. The proof thus showed, as was in effect alleged by appellee, that the only available means left for the collection of this debt was a resort to the liability of Godair, Harding & Co. for a conversion of the first mortgage security.

In submitting the issues to the jury, the charge of the court referred to the sixth, seventh, eighth, ninth, tenth, and eleventh paragraphs of appellee's petition for a description of the cattle shipped, as well as for the dates of the several shipments, the places from and to which shipped, and the manner of the alleged shipments.

Of these paragraphs, the sixth reads: "That said defendants, with intent to defraud plaintiff, unlawfully procured and caused said J. L. Gray & Co. and the members of said firm, on, to wit, the 7th day of September, 1894, to ship out of Texas by rail, from the town of Miami, in Roberts County, Texas, which is the nearest shipping railway station to said Gray County, to defendants at Kansas City, 169 head of cows and 167 head of calves, all of which were mortgaged to plaintiff as aforesaid, said calves being the increase of said cattle described in said two mortgages. Said cattle so shipped were received and handled at Kansas City for defendants by George R. Barse Live Stock Commission Co., a corporation engaged in the live stock commission business at said city, and are and were at said time the agents of the defendants. That said cows at said time were reasonably worth $13 per head, and said calves were at said time worth $6 per head. And defendants did then and there cause said cows and calves to be sold at said prices, disposed of and slaughtered, and said defendants did then and there willfully and wrongfully appropriate to their own use and benefit the proceeds of the sale of said cattle, to wit, $3199.50, without the knowledge or consent of plaintiff."

The other paragraphs were of like import, the seventh relating to a shipment on October 23, 1894, from Miami to Kansas City, of 344 cows of the value of $13 per head, and 98 calves of the value of $6 per head; the eighth relating to a like shipment on November 14, 1894, of 51 cows of the value of $13 per head, and 32 calves of the value of $5.50 per head; the ninth relating to a shipment on August 15, 1894, from Midland to East St. Louis, of 11 cows alleged to be worth $15 per head, and 32 calves worth $6 per head; and the tenth relating to a like shipment on November 16, 1894, of 200 cows of the alleged value of $15 per head.

The petition, in connection with these paragraphs, further alleges: "That all of the above described calves were the issue of the cattle described in plaintiff's said mortgages, and that the brands of the other above described cattle so taken out of Texas and disposed of by defendants without the knowledge of plaintiff are wholly unknown to plaintiff, and that plaintiff is unable to give or ascertain said brands, by reason of the spoliations, mixing, confusing, and destruction of said brands and said cattle as aforesaid, and wrongful acts of defendants as aforesaid. That the defendants well knew or could have ascertained said brands and cattle when they had charge of said cattle as aforesaid, but mixed and confused said cattle with their own or other cattle at said time, and then disposed of the same as aforesaid."

The eleventh paragraph reads: "That thereafter said defendants illegally and willfully, and with intent to defraud plaintiff, caused and procured said Grays to ship in the name of their said agents, A. F. and H. E. Crowley, by rail from the town of Midland, Texas, to defendants at East St. Louis, on, to wit, the 20th day of September, 1895, 67 head of steer cattle which were mortgaged to plaintiff as aforsaid, 61 branded thus: □ □ □ on left side, and 6 head branded thus: ℞ on left side and 2 on left hip. That all of said cattle at said time were of the market value of $25 per head. Defendants did then cause the same to be sold for said price, destroyed, and slaughtered, and defendants did then and there appropriate and convert to their own use and benefit the proceeds of said sale, to wit, the sum of $1725, without the knowledge or consent of plaintiff."

The petition (fourteenth paragraph) contained the further allegation that, if plaintiff was mistaken in his cause of action as alleged for the conversion of the cattle, the Grays were authorized to ship and sell said cattle for the sole purpose of paying off their said note to appellee, and charged Godair, Harding & Co. with conversion of the proceeds of the several sales aforesaid. It admitted a credit of $3000, paid to appellee by appellants in November, 1894.

The evidence tended to prove all these allegations, and the issues thus arising were given in charge to the jury. There was sufficient evidence also to warrant findings in favor of appellee on the several issues so submitted, and perforce of the verdict, therefore we so find, both as to the liability of appellants and the amount thereof, substantially as alleged. True, the findings to a great extent are but deductions from unexplained circumstances which it was presumptively within the power, as it was the duty, of appellants to explain, but their failure to offer any such explanation justified the inferences which in a general way appellee's evidence tended to establish. For instance, he proved the several shipments by Gray & Co. from Midland and Miami, and denied that he had authorized them; he proved the market value of the cattle; that they were sold on the market in Kansas City and East St. Louis by or for Godair, Harding & Co., and the proceeds of such sales applied to the debt of Godair,

Harding & Co., without his knowledge or consent; that Gray & Co. made no shipments except to Godair, Harding & Co., and that whatever cattle thus shipped and sold were not covered by appellee's mortgages were the cattle above referred to upon which Godair, Harding & Co. had a separate mortgage, and that all had been indiscriminately mixed and blended, so that it was impossible for appellee to estimate their relative number and value, or to otherwise distinguish the proceeds of the sales of the one from the other. Appellants did not attempt to do so, or to prove their inability to do so.

It was shown by the cattle inspector's testimony that the cattle shipped from Midland were in the brands covered by appellee's mortgages, but of those shipped from Miami, in Gray County, where there was no inspector, the brands could not be reproduced. Besides, the calves were not branded, and it was with these, that is, with the cattle in Gray County especially, that those upon which appellants had a separate mortgage appear to have been mixed and blended in the common shipments by Gray & Co. to the order of Godair, Harding & Co. As to the Crowley shipment, the evidence was conflicting. He was the agent of appellants at Midland, and was fully cognizant of the rights of appellee. He testified, however, that the sixty-seven steers shipped by him, though covered by appellee's mortgage, he had purchased subsequently from Gray & Co., and denied that he was acting for appellants in this shipment; but appellee proved that he had made a contrary statement to his agent, Ben Tillar, to the effect that the shipment had been made for the benefit of Godair, Harding & Co. and the proceeds applied to their debt against Gray & Co., and Crowley did not quite deny having made such a statement. Appellee's mortgage covered these steers, and Godair, Harding & Co. got the proceeds of sale,—whether as a credit upon their debt against Gray & Co. or for the credit of Crowley was for the jury to say, after weighing the conflicting statements of Crowley.

Appellants, in order to sustain one of their pleas, introduced evidence tending to show that the money borrowed of them by Gray & Co. had been borrowed for and used in the payment of ranch expenses and the expense of moving the cattle from Midland to Gray County, to which removal appellee had given his previous written consent. The court in the fourth paragraph of the charge submitted this defense to the jury, and the evidence warranted them in finding, if it did not require them to find, that the money had been in part so borrowed and expended; but they were also justified in finding, if not required to find, as further submitted in this charge, that appellee had not agreed with Gray & Co. to allow them to sell said cattle and apply the proceeds to the payment of the expenses of driving the cattle to Gray County. They were further justified by the evidence in finding that the maximum limit of $2500 for current ranch expenses had been greatly exceeded, and may have allowed appellants, under this charge, a credit to that extent.

In support of still another plea, appellants introduced evidence tending to show that appellee had allowed Gray & Co. a very large discretion

in the matter of selling cattle covered by the mortgages, and in the application of the proceeds of such sales, the contention being that the manner of conducting the business on the part of Gray & Co. was such as to warrant the conclusion by persons dealing with them that they had authority to sell the cattle without restriction. In the sixth special charge given at the request of appellants this defense was submitted to the jury, but was not sustained by the verdict; and we are not prepared to disturb the finding in that respect as being without evidence to support it, though the evidence might have justified a contrary finding.

However, we do not regard this feature of the verdict as material, because we are of opinion that the appellants were not in a position to avail themselves of the principle of estoppel thus litigated. The mortgage which they took expressly recognized the superiority of appellee's lien, and while it purported to be made in furtherance of the provisions contained in the agreement quoted, it was nevertheless subject to the restriction therein contained, that the proceeds of "any and all sales," beyond the amount necesary to defray the expenses of running and maintaining the ranch, not to exceed $2500 per annum, should be applied in payment of the notes secured by appellee's prior mortgages. As no shipments were made to the Indian Territory after appellants' mortgage was made, we ignore that part of the agreement. They could not, as the holders of a junior mortgage, be heard to insist upon the appropriation to their own debt of the entire proceeds of the cattle required to pay the debt secured by the prior or superior mortgages, when they had taken their own mortgage subject thereto.

For the same reason, we hold to be inapplicable the further proposition, to sustain which Maier v. Freeman (Cal.), 44 Pacific Reporter, 357, is cited, that "where the mortgagee of personal property consents that the mortgagor remain in possession, with authority to handle, sell, and dispose of the property, the mortgagor becomes the agent of the mortgagee, and a sale by him passes the title free from the lien of the mortgagee, and the mortgagee must look to the mortgagor for the application of the proceeds of such sale, and not to the purchaser of the mortgaged property."

Several rulings made upon the admission and exclusion of evidence are complained of, but the brief fails to show any prejudicial error in these several rulings. Indeed, in almost every instance the brief fails to disclose, though very full in many other respects, the particular ground of objection urged to the admission or exclusion of the evidence. After carefully reading a brief of 136 printed pages, we do not feel called upon to search through a manuscript record of 379 pages in order to find what particular objections were considered by the court in these several incidental rulings. Johnson v. Crawl, 55 Texas, 571, and subsequent cases.

The charge is also complained of, as well as the court's refusal to give about twenty special charges. The sixth special charge given at the request of appellants went quite as far as, if not further than, they had any right to expect, and none of the other special charges set out in the

brief should have been given. The main charge was substantially correct. It may be that, since the rule or principle of confusion of goods which it embodied is but a rule of evidence (Holloway S. Co. v. Bank, 47 Southwestern Reporter, 96), it should have been left out of the charge; but the pleading above quoted put the matter in issue, and it is not clear that this particular objection has been made to the charge, and if it has, the evidence would seem to admit of but one finding on that issue.

It is believed that the foregoing conclusions cover all the material issues raised by the sixty-six assignments of error, which are entirely too many to admit of discussion in detail.

The judgment is therefore affirmed.

*Affirmed.*